**In re WHO'S WHO WORLDWIDE REGISTRY, INC., Debtor.**

**Bruce Gordon, Appellant,**

v.

**Allan B. Mendelsohn, Salomon Green & Ostrow, P.C., Nicholas F. Kajon, and Christine Jagde, Appellee.**

Nos. CV 96–2975(ADS), CV 96–5955(ADS).

United States District Court, E.D. New York.

March 16, 1999.

Backenroth & Grossman LLP, New York City, by Abraham Backenroth, of counsel, for appellant Bruce Gordon.

Salomon Green & Ostrow, P.C., New York City, by Nicholas F. Kajon and Christine Jagde, of counsel, for Allan B. Mendelsohn, Chapter 7 trustee/appellee.

## *MEMORANDUM AND ORDER*

SPATT, District Judge.

This is an appeal from an order of the Bankruptcy Court, (Eisenberg, B.J.) dated November 6, 1996 ("the November 6, 1996 order") (96 CV 5955[ADS]) which fixed Bankruptcy Rule 9011 sanctions against Bruce Gordon ("Gordon") in the amount of $12,556. Gordon is the former Chief Executive Officer and a Director of the Debtor Who's Who Worldwide Registry, Inc. ("the Debtor"). Also pending before this Court is Gordon's prior appeal (96 CV 2975[ADS]) from Judge Eisenberg's order dated May 13, 1996 ("the May 13, 1996 order") which granted the underlying Rule 9011 sanctions against Gordon and his former bankruptcy counsel, Thomas R. Califano, Esq. ("Califano") of the law firm of Morrison Cohen Singer & Weinstein LLP ("Morrison Cohen").

At the outset, the Court notes that Califano has settled his contempt sanction by payment of the sum of $10,000 and has withdrawn his appeal from the May 13, 1996 order.

On November 4, 1996, Gordon filed his appeal brief (the "First Appeal Brief") in connection with his appeal of the May 13, 1996 order. The Court will first deal with the May 3, 1996 order. If the May 13, 1996 order is affirmed, then the Court will consider the appeal from the November 6, 1996, which contests the amount of the sanction. If the May 13, 1996 order is reversed, the November 6, 1996 order fixing the amount of sanctions would also fall.

## I. THE APPEAL BY GORDON OF THE MAY 13, 1996 ORDER WHICH IMPOSED THE SANCTIONS

On March 22, 1994, the Debtor filed a voluntary petition under Chapter 11 of Title 11 of the United States Bankruptcy Code. By order dated October 19, 1995, the Bankruptcy Court approved the appointment of Allan B. Mendelsohn ("Trustee") as the Chapter 11 operating trustee. On the Trustee's motion, the Court, by order dated January 17, 1996 converted the Debtor's Chapter 11 reorganization case to a liquidation case under Chapter 7. Mendelsohn was appointed as the Chapter 7 trustee and retained the firm of Solomon Green & Ostrow, P.C. as his attorneys.

Upon his appointment and in accordance with his statutory duty under Bankruptcy Code Section 704(1), the Trustee began to collect and reduce to money the property of the Debtor's estate. In so doing, the Trustee reviewed the Debtor's Petition and sworn bankruptcy schedules ("the schedules") to determine the extent of the Debtor's assets. As the Debtor President, Gordon executed the schedules, under penalty of perjury.

In a rider ("the Rider") annexed to Schedule G of the Schedules entitled "Executing Contracts and Unexpired Leases," Gordon listed the lease to a Penthouse located at 250 East 54th Street, New York,

New York ("the Penthouse") as one of the Debtor's unexpired leases. The Rider stated "lease on apt in NYC (2 yrs.) 250 E. 54th Street, Apt. PH–4, New York, New York." The Rider did not state that the Penthouse had any co-tenants, nor did it indicate that any other person or entity other than the Debtor had any interest in the Penthouse. However, Gordon was listed as an "occupant" and the lease provides that the apartment shall be used only for residential purposes.

Also, in Schedule B—Personal Property, Item 3, Gordon noted as an asset of the Debtor, a security deposit with W & M Properties, Inc. in the amount of $12,000 (the "Security Deposit"). This firm was the agent for the landlord of the Penthouse. So that in the Debtor's Schedules, Gordon swore that the lease to the Penthouse and the Security Deposit for the lease were assets of the Debtor.

The owner of the Penthouse was an entity known as Palais Partners (the "Owners"). The Debtor's lease was for a term of two years and fifteen days, which commenced on February 15, 1994 and expired on February 29, 1996. The rent was $96,000 per year, payable in monthly installments of $8,000. The tenant named in the lease was "Who's Who Worldwide Registry, Inc." In addition, the Debtor had procured an insurance policy on the assets located in the Penthouse. The Debtor was the named insured under this policy which covered the contents and assets of the Penthouse and also provided general liability insurance covering the premises. The Trustee contends that the Debtor was the corporate tenant of the lease for the Penthouse.

At a deposition on April 14, 1994, Gordon testified that the function of the Debtor's Lease was "to enhance the members, corporate meetings for our members." He also testified that "international people could stay at the 250 East 54 Street address, dinner meetings for networking in the apartment." Gordon also stated that

"we're [the Debtor] not charging [the Debtor's customers] for using the apartment, it's in the membership." When questioned about his use of the Penthouse, Gordon never stated that it was his residence. In fact, he testified that his residence was a condominium located at 200 Hummingbird Road, Manhasset, New York (the "Manhasset condo").

In addition, Gordon testified that, during the nineteen months that he operated the Debtor's business under Chapter 11, the Debtor was the tenant under the Lease. Further, Gordon stated that the purpose of the Lease was to enhance the Debtor's corporate membership by allowing its members to use the Penthouse for corporate meetings, networking and overnight stays. It was not until the Trustee sought to sell the assets in the Penthouse that Gordon, for the first time, took the position that "the Penthouse was used as Gordon's residence in New York" and that he personally owned the assets in the Penthouse.

The record further reveals that the owners of the Penthouse understood that the Debtor was the legal tenant under the Lease. Bills for monthly rent and utilities were sent to the Debtor at its address. After the Debtor defaulted in paying the monthly rent, the owners moved in Bankruptcy Court to lift the automatic stay so as to regain possession of the Penthouse.

Shortly after his appointment, the Trustee sought to obtain all of the Debtor's records. After some delay, on November 29, 1995, Gordon turned over two boxes of documents stating that these were the only books and records of the Debtor in his possession. Gordon asserted that all of the Debtor's other books and records had been seized by the United States Government ("the Government") in a civil forfeiture action.

However, by a stipulation dated June 6, 1995 and So Ordered by this Court, the Government agreed to return all of the property seized on March 30, 1995, including the Debtor's books and records. In June, 1995, the Government did return to the Debtor the seized books and records, consisting of approximately 100 boxes and 40 file cabinets filled with documents.

On January 23, 1996, the Trustee secured the assets in the Penthouse by having the locks changed and discontinuing elevator access to the Penthouse. Discussions then ensued between counsel for the Trustee and the Debtor, at which time Gordon asserted that all of the assets in the Penthouse personally belonged to him. After discussions as to what assets belonged to Gordon, a walk-through took place on January 24, 1996, at which time Gordon was permitted to remove some personal property which was in the Penthouse consisting of some clothing and baby items. At that time, a dispute arose with regard to Gordon's attempt to remove certain documents in the apartment. The dispute was resolved by each side agreeing to leave the documents in the Penthouse until Gordon's attorney could review the documents.

Commencing on January 29, 1996, the Trustee's counsel entered into negotiation with regard to the Debtor's books and records with Thomas Califano, Esq., Gordon's new counsel. Califano contended that some of the documents were Gordon's personal papers. When negotiations broke down, on February 16, 1996, the Trustee's counsel served a Notice of Hearing requesting permission to sell the Debtor's assets. On February 23, 1996, a few days prior to the expiration of the Debtor's lease, and after unsuccessfully attempting to reach Califano by telephone, the Trustee's counsel retrieved and reviewed the documents in the Penthouse.

According to the Trustee, the records contained evidence of fraud on the creditors in the manner of "excessive post-petition transfers from the estate which bankrolled Gordon's lavish lifestyle" (Appellee's Brief at 21). The Trustee contends that the records did not relate to either Gordon's attorney-client privilege or the pending criminal investigation. Califano was

invited to review the records, but he refused saying that it was "too late."

On February 28, 1996, upon the request of Califano, the Trustee's counsel sent a complete schedule of the records and an index of the documents to Califano, together with a letter setting forth the Trustee's intent to bring any violation of federal law to the attention of the United States Attorney. On that same date, Gordon filed a complaint in an adversary proceeding seeking damages against the Trustee and his counsel. Gordon also moved to enjoin the sale of the Debtor's assets and to compel release of the Debtor's books and records. At a scheduled deposition on March 4, 1996, Gordon refused to answer any questions, invoking his Fifth Amendment privilege.

The Debtor's records revealed that it made post-petition payments for insurance, lease payments for Gordon's Mercedes and taxes for the Manhasset condo which was acquired and furnished by the Debtor's funds. Also, until one month prior to the Trustee's appointment, the monthly maintenance charge on the Manhasset condo was paid by the Debtor. Notwithstanding all of this strong factual evidence of the Debtor's ownership of all the properties and records, Gordon pressed his complaint seeking monetary damages against the Trustee and his counsel and for an injunction staying the sale of the Debtor's assets and to compel the release of the Debtor's books and records.

### A. *The Dispositions in the Bankruptcy Court*

At a hearing held on March 8, 1996, before Judge Eisenberg, the court held that "all the evidence presented and the documents clearly reflect that (The Penthouse) is the Debtor's premise, that the leasehold is owned by the debtor, that the contents are owned by the debtor" (Trustee's counterdesignation at Exhibit E p. 16, lines 18–24). During the hearing Judge Eisenberg stated:

THE COURT: Unless I have evidence to the contrary, I'm going to permit the sale, because prima facie, on its face it appears to be property of the estate, and the trustee has the right to sell property of the estate.

*See* Trustee's Counterdesignation at Exhibit F. p. 17, lines 4–8.

When Gordon's counsel argued that he could not provide evidence of his ownership because of fear of self-incrimination in the criminal investigation, Judge Eisenberg stated "they take their choice."

On April 8, 1996, the Bankruptcy Court held a hearing on the Trustees cross-motion for sanctions pursuant to Bankruptcy Rule 9011 and 28 U.S.C. § 1927. The Court was concerned with Gordon pressing the complaint in the adversary proceeding against the Trustee and his counsel. In addition, the Court was perturbed that Gordon insisted on seeking the injunction despite the substantial evidence of the Debtor's ownership of the assets, as reflected in the books and records, and despite the opportunity to raise the issue of the ownership of the assets in the Bankruptcy proceeding, without the necessity of a separate adversary proceeding seeking damages.

THE COURT: Then again, why wasn't it (the adversary proceeding complaint) withdrawn. When there is an action in the Bankruptcy Court to sell property and somebody believes they have an interest in it, all they have to do is come into Court and say, don't permit the sale of this property because it doesn't belong to the estate. It does not require an adversary proceeding for damages against the Trustee and Trustee's counsel.

\* \* \* \* \* \*

All you had to do was come into court and respond because there was a hearing, there was notice and the notice said, anybody who objects, the Court will hear them before a sale. The sale was

not authorized when you commenced your adversary proceeding.

*See* Record at Exhibit 10, page 16, lines 8–14 and 19–23.

## B. *The May 13, 1996 Order*

Following the hearing on April 8, 1996, Judge Eisenberg issued Findings of Fact and an Order imposing sanctions on Gordon and Califano in an amount to be later determined at a hearing. The Bankruptcy Court adopted the Trustee's proposed findings virtually verbatim, culminating in the May 13, 1996 order. The Bankruptcy Court's Findings of Fact and Conclusion of Law are as follows:

1. On March 22, 1994 (the "Filing Date"), the Debtor filed a voluntary petition (the "Petition") for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"). Pursuant to §§ 1107 and 1108 of the Bankruptcy Code, the Debtor continued in possession of its property and management of its affairs until the appointment of the Trustee. On May 2, 1994, the United States Trustee appointed an official committee of unsecured creditors.

2. By Order dated October 12, 1995, this Court directed the United States Trustee to appoint a Chapter 11 trustee. By Order dated October 19, 1995, this Court approved the appointment of Allan B. Mendelsohn as Chapter 11 Trustee.

3. Upon motion of the Trustee, this Court, by Order dated January 17, 1996, converted the Debtor's Chapter 11 reorganization case to a liquidation case under Chapter 7; thereafter, Mr. Mendelsohn was appointed as the Chapter 7 Trustee. The Trustee is now acting in that capacity.

4. On or about January 31, 1994, Gordon, acting in his capacity as President of the Debtor, caused the Debtor to enter into a lease agreement (the "Penthouse Lease") with respect to the Penthouse for a term of two years and fifteen days expiring February 29, 1996, for rent in the amount of $96,000 per annum.

5. On or about March 24, 1994, Gordon executed under penalty of perjury the schedules required to be filed by the Debtor pursuant to Bankruptcy Rule 1007 (the "Schedules"). In Item 3 of Schedule B—Personal Property, Gordon scheduled as an asset of the Debtor a security deposit in the amount of $12,000 under the Penthouse Lease. In a rider annexed to Schedule G—Executory Contracts and Unexpired Leases, the Penthouse Lease was enumerated as one of the Debtor's unexpired leases. The Schedules did not reflect that the Penthouse had any co-tenants or that any person or entity, other than the Debtor, had any interest therein.

6. During the Chapter 11 phase of the Debtor's case, Gordon testified under oath that the Penthouse was used by the Debtor for corporate purposes.

7. Gordon caused the Assets to be insured in the name of the Debtor.

8. Immediately upon his appointment, and in accordance with his statutory duties under the Bankruptcy Code, the Trustee sought to obtain all of the Debtor's books and records. After Debtor's counsel failed to return at least two telephone calls, on October 24, 1995, Trustee's counsel sent a letter to Debtor's counsel requesting that the Trustee be provided with information as to the location, nature and persons possessing the Debtor's books and records.

9. Failure of Debtor's counsel to respond to written and telephonic requests for information pertaining to the books and records prompted the Trustee to send a letter, dated November 13, 1995, to the Debtor's counsel urging his cooperation.

10. During a meeting among Kajon, Gordon and Martin Reefsin (the Debtor's accountant) on November 29, 1995, Gordon turned over only two boxes (approximately 11.5″ wide × 17″ long × 8″

deep) of documents, claiming that these were the only books and records of the Debtor that were in his possession.

11. When questioned by Kajon as to the very limited amount of books and records in his possession, Gordon claimed that all of the Debtor's books and records had been seized (the "Seizure") by the United States Government (the "Government") in a civil forfeiture action. Gordon claimed that, despite District Judge Spatt's order directing the return of the Debtor's records, the Government failed to return most of said records.

12. By stipulation dated June 6, 1995 (the "Return Stipulation"), and so-ordered by United States District Judge Spatt, the United States Government agreed to return to the Debtor all of the property seized on March 30, 1995 by the United States Postal Inspection Service, pursuant to a search warrant issued on March 22, 1995. Included in the seized property was the Debtor's books and records.

13. On January 23, 1996, the Trustee's attorney secured the Penthouse and took reasonable steps to deny Gordon access thereto.

14. Thereafter, on January 24, 1996, the Trustee provided access to the Penthouse to Gordon and his agents so that Gordon could remove clothing and certain personal items from the Penthouse. At that time, in contravention of his prior agreement with the Trustee, Gordon attempted to remove certain of the Documents from the Penthouse, but was prevented from doing so by Jadge.

15. Gordon and Califano took the position that some of the Documents were subject to Gordon's attorney-client privilege, and/or pertained to a pending criminal investigation of Gordon. Califano's basis for making this assertion was that Gordon had so stated this to be true, and Gordon's criminal counsel also indicated this to be true pursuant to a telephone conversation between Califano and Gordon's criminal counsel. The Trustee's position was that the Documents were either property of the Debtor's estate which Gordon had failed to turn over to the Trustee, as required pursuant to § 521(4) of the Bankruptcy Code, or were discoverable by the Trustee. The parties attempted to resolve this dispute for a period of approximately one month, to no avail. No agreement was put in writing and this Court finds there was no binding agreement which prevented the Trustee and his counsel from obtaining the Debtor's books and records.

16. On February 16, 1996, the Trustee served notice of his motion to sell the Debtor's assets located at the apartment, free and clear from all claims, liens and interests, with the same, if any, to attach to the net proceeds of sale (the "Sale Motion"). The Sale Motion was scheduled to be heard on March 8, 1996.

17. On February 23, 1996, Trustee's counsel retrieved the Documents from the Penthouse, and began examining the Documents. Given the circumstances, the Court finds that the Trustee acted reasonably in retrieving the Documents from the Penthouse and examining the Documents.

18. The Documents did in fact consist primarily of the Debtor's books and records, which Gordon should have known were Debtor's records and which he should have turned over to the Trustee pursuant to § 521(4) of the Bankruptcy Code. The Documents included evidence that the Assets had been insured in the Debtor's name and that certain of the assets which Gordon claimed he had purchased had in fact been purchased with the Debtor's funds.

19. On February 23, 1996, the date that Trustee's counsel retrieved the Documents from the Penthouse, Kajon and Jadge advised Califano that the Documents consisted primarily of the Debtor's books and records and that there did not appear to be any docu-

ments subject to any attorney-client privilege which Gordon could assert. At that time, Trustee's counsel offered Califano the opportunity to review the Documents, which offer Califano declined. If Califano had reviewed the Documents at this point in time, he would have discovered that the Documents included receipts which proved that the items Gordon claimed were his were in fact purchased with Debtor's funds.

20. On Monday, February 26, 1996, a paralegal at Morrison requested copies of the Documents. Trustee's counsel agreed to comply with such request, noting that it would take a couple of days. The Documents were delivered to Morrison on February 28, 1996. The Complaint and Injunction Motion were signed by Califano on February 27, 1996 and filed on February 28, 1996. Pursuant to the Injunction Motion, Gordon sought, *inter alia,* to enjoin the Trustee's use, dissemination and copying of the Documents, and a turnover of the Documents. Three of the five claims for relief in the Complaint sought damages against the Trustee and his counsel for examining the Documents.

21. Gordon knew or should have known the content of the Documents, and knew or should have known that the Documents consisted primarily of the Debtor's books and records.

22. In retrieving and examining the Documents, the Trustee was acting in accordance with his duties pursuant to § 704 of the Bankruptcy Code.

23. Trustee's counsel received a copy of the Injunction Motion on Thursday, February 29, 1996, and later that day served a notice to take Gordon's deposition on Califano. The deposition was scheduled for Monday, March 4, 1996. On Friday, March 1, 1996, Trustee's counsel received a call from Califano advising that Gordon would assert his Fifth Amendment privilege against self-incrimination with respect to all the questions to be raised at the deposition.

At the March 4, 1996 deposition, Gordon did just that, refusing to answer all the questions including identifying where he resides.

24. The respondents continued to prosecute the action. The day after the deposition, Califano served an objection to the Sale Motion, which incorporated and relied on Gordon's Injunction Motion and the papers in support thereof. If Gordon had good reason to believe he could prove that certain items of personal property were not Debtor's property, then the objection to the Sale Motion would not be sanctionable *per se* as to Gordon. However, Gordon knew or should have known that the assets in question were property of the Debtor's estate and his actions in connection with the opposition to the Sale Motion are sanctionable.

25. At the March 8, 1996 hearing, Califano appeared in support of Gordon's Injunction Motion and in opposition to the Sale Motion. At the hearing on the Sale Motion, the Trustee presented independent overwhelming evidence that the Assets were property of the estate, *e.g.* Gordon had previously sworn in this Court that the premises belonged to the Debtor, the Assets were purchased with the Debtor's money, and the Assets were insured in the Debtor's name. At the March 8, 1996 hearing, the Sale Motion was granted and the Injunction Motion was denied. Orders memorializing such relief were entered on March 8, 1996 and March 15, 1996, respectively.

26. Califano failed to explain why the Complaint against the Trustee and Trustee's counsel was not dismissed after a full set of the Documents was delivered to Califano on February 28, 1996, which was prior to the Sale Motion. Gordon refused to testify and Califano is unable to relate what steps he took to discover whether the assets in question were property of Gordon's beyond merely relying on Gordon's unsupported assertions. It appears that Cali-

fano took no further action to gain any independent knowledge to enable him to sign pleadings in opposition to the Sale Motion. Such actions by Califano are sanctionable unless Califano can demonstrate to the Court that he took any steps to independently verify Gordon's assertions regarding ownership of the assets in question.

27. Gordon commenced this adversary proceeding pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure. This is a core proceeding pursuant to 28 U.S.C. §§ 1334(b) and 157(b)(1) and (b)(2)(A), (C) and (O); it arises under the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure, and is related to the Debtor's Chapter 7 case. Venue is proper in this district pursuant to 28 U.S.C. § 1409(a) because this suit arises under Title 11, and arises in and is related to the Debtor's Chapter 7 case pending in this Court.

28. On March 27, 1996, Gordon's new counsel, Backenroth & Grossman, LLP, signed a notice of voluntary dismissal of this adversary proceeding on Gordon's behalf pursuant to Rule 41(a) of the Federal Rules of Civil Procedure, as made applicable herein pursuant to Rule 7041 of the Federal Rules of Bankruptcy Procedure (the "Notice of Voluntary Dismissal").

29. To the extent that the Complaint sought damages against the Trustee and his counsel, the Complaint was not well grounded in fact; and was not warranted by existing law or a good faith argument for the extension, modification or reversal of existing law.

30. To the extent that the Injunction Motion sought to restrain the Trustee from using, disseminating or copying the Documents and sought a turnover of the Documents which Documents had been in the prior possession of and under control of Gordon who knew they were Debtor's property, the Injunction Motion was not well grounded in fact and was not warranted by existing law or a good faith argument for the extension, modification or reversal of existing law.

The Bankruptcy Court then issued the following order:

it is hereby

Ordered, Adjudged and Decreed, that the Trustee's Cross–Motion to impose sanctions against Gordon and Califano pursuant to Rule 9011 of the Federal Rules of Bankruptcy Procedure is hereby granted. Gordon's sanctions are based on his pursuit of the Complaint and the Injunction Motion when he knew or should have known that: (a) the Documents did not pertain to any criminal investigation, nor were they subject to the attorney-client privilege; and (b) the assets to be sold pursuant to the Sale Motion are properly of the Debtor's estate. Califano's sanctions are based on his (a) failure to withdraw the complaint after he had the opportunity to review the Documents; and (b) failure to make any independent inquiry regarding ownership of the assets, unless he can provide to the Court evidence of such independent inquiry, which may result in a finding that sanctions are not warranted as to this action, or that the sanctionable conduct is mitigated. The Trustee's Cross–Motion to impose sanctions against Morrison pursuant to 28 U.S.C. § 1927 is hereby denied; and it is further

Ordered, Adjudged and Decreed, that pursuant to Rule 9011 of the Federal Rules of Bankruptcy Procedure, sanctions shall be imposed against Gordon and Califano in an amount to be determined by this Court at a hearing to be held on the 14th day of May, 1996.

### C. The "Final Order" Contention—the November 1996 Order

The Trustee contends that the May 13, 1996 order is not a "final order" and leave to appeal should thus be denied. This contention, however, is rendered moot as a result of the subsequent order of Judge Eisenberg, dated November 6, 1996, which

granted sanctions against Gordon in the amount of $12,556, pursuant to Rule 9011.

In the November, 1996 order, Judge Eisenberg determined that "at least $22,-550 in fees were incurred as a result of Gordon's and Califano's sanctionable conduct. After deducting the $10,000 paid by Califano to the Trustee, the remainder ($12,550) shall constitute the sanctions awarded against Gordon."

## II. *DISCUSSION*

### A. *Standard of Review*

Findings of fact made by a Bankruptcy Court are reviewed by the District Court on appeal under a clearly erroneous standard, (*See* 11 U.S.C. Bankruptcy Rule 8013), while conclusions of law are reviewed *de novo. In re Momentum Manufacturing Corp.*, 25 F.3d 1132, 1136 (2d Cir.1994); *In re PCH Associates*, 949 F.2d 585, 597 (2d Cir.1991).

Bankruptcy Rule 8013 sets forth the standard of review as to findings of fact, as follows:

> Rule 8013. Disposition of Appeal; Weight Accord Bankruptcy Judge's Findings of Fact
>
> On an appeal the district court of bankruptcy appellate panel may affirm, modify or reverse a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings. Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses.

■ A reasonable interpretation of evidence different than that reached by the Bankruptcy Court is clearly not enough to overturn the Bankruptcy Court's ruling; the court's finding of facts must be clearly erroneous, *Szewczyk v. Wojtaszek*, 164 B.R. 604 (N.D.Ill.1994). A Bankruptcy Court's findings of facts are "clearly erroneous" if the appellate court

has a definite and firm conclusion that a mistake has been committed, after reviewing the entire record. *In re Briscoe Enterprises, Ltd.*, 138 B.R. 795 (N.D.Tex. 1992), *rev'd on other grounds*, 994 F.2d 1160 (5th Cir.1993).

### B. *The Content of the Decision of the Bankruptcy Court*

■ Initially, the Court notes that the Bankruptcy Judge did not issue a written opinion. The Court virtually adopted verbatim the proposed finding of facts and conclusion of law submitted by the Trustee. (*Cf.* 10–11 with 10–17). This procedure is frowned upon and requires the reviewing Court to "engage in a more careful analysis of adopted findings" than those actually authored by the Bankruptcy Judge. *See U.S. v. El Paso Natural Gas Co.*, 376 U.S. 651, 656–657, 84 S.Ct. 1044, 1047, 12 L.Ed.2d 12 (1964); *Hagans v. Andrus*, 651 F.2d 622, 626 (9th Cir.) *cert. denied* 454 U.S. 859, 102 S.Ct. 313, 70 L.Ed.2d 157 (1981); *see also Andre v. Bendix Corp.*, 774 F.2d 786, 799–801 (7th Cir. 1985).

### C. *Were Sanctions Legally Appropriate?*

■ We begin with the rule under which the sanctions were imposed. Bankruptcy Rule 9011 permits a court to impose sanctions on attorneys or parties who assert frivolous claims and defenses in a bankruptcy proceeding. Rule 9011 parallels Federal Rule of Civil Procedure 11, containing "only such modifications as are appropriate in bankruptcy matters." *Cinema Serv. Corp. v. Edbee Corp.*, 774 F.2d 584, 585 (3d Cir.1985). Accordingly, this Court's review of the application of Rule 9011 sanction by the Bankruptcy Court is informed by Rule 11 jurisprudence.

■ In this regard, the Court finds instructive the language of the Second Circuit as stated in *Matter of Cohoes Industrial Terminal, Inc.*, 931 F.2d 222, 227 (2d Cir.1991):

As in Rule 11 cases, we review the imposition of sanctions pursuant to Bankruptcy Rule 9011 using the abuse of discretion standard. *See Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990); *Mareno v. Rowe*, 910 F.2d 1043 (2d Cir. 1990), *cert. denied*, 498 U.S. 1028, 111 S.Ct. 681, 112 L.Ed.2d 673 (1991). We are mindful, however, that "legal errors on the part of the [lower courts] will constitute an abuse of discretion." *Mareno*, 910 F.2d at 1047.

In order to impose Rule 9011 sanction, a bankruptcy court must find that an attorney has submitted a claim that has no chance of success under existing precedents and that fails to advance a "reasonable argument to extend, modify or reverse the law as it stands." *Id.* at 1047; *see also Securities Indus. Ass'n v. Clarke*, 898 F.2d 318, 321 (2d Cir.1990). Essentially, the court may sanction on the basis of Rule 9011 if an attorney advances a frivolous argument.

A petition for Chapter 11 bankruptcy may be deemed frivolous if it is clear that on the filing date there was no reasonable likelihood that the debtor intended to reorganize and no reasonable probability that it would eventually emerge from bankruptcy proceedings. *See, e.g., Carolin Corp. v. Miller*, 886 F.2d 693, 698–702 (4th Cir.1989); *In re Coffee Cupboard, Inc.*, 119 B.R. 14, 17–18 (E.D.N.Y.1990); *In re Marion Street Partnership*, 108 B.R. 218, 223 (Bankr. D.Minn.1989).

Mindful of the potential severe chilling effect of Rule 9011 sanctions on counsel and the parties, and the concomitant restraint on legal creativity and effective representation, the Second Circuit has counseled that "any and all doubts must be resolved in favor of the signer." *Eastway Construction Corp. v. City of New York*, 762 F.2d 243 (2d Cir.) *cert. denied*, 484 U.S. 918, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987).

The rule was well stated in *In re HBA East, Inc.*, 101 B.R. 411, 415 (Bankr.E.D.N.Y.1989):

The Second Circuit reiterated this admonition in *Oliveri v. Thompson*, 803 F.2d 1265, 1275 (2d Cir.1986) *cert. denied*, 480 U.S. 918, 107 S.Ct. 1373, 94 L.Ed.2d 689 (1987) and *Calloway v. Marvel Entertainment Group*, 854 F.2d 1452, 1469–70 (2d Cir.1988). *Accord, Two Star Surgical Supply Inc. v. New York State Department of Social Services (In re Two Star Surgical Supply, Inc.)*, 92 B.R. 26, 29 (E.D.N.Y.1988). Thus, the Second Circuit held that only "where it is *patently clear* that a claim has absolutely no chance of success under the existing precedents, and where no reasonable argument can be advanced to extend, modify or reverse the law as it stands, Rule 11 has been violated." *Eastway, supra*, 762 F.2d at 254 [Emphasis Added]. What we glean from the Second Circuit's teaching is that a legal position is unwarranted by law only where, after reasonable inquiry, an attorney would recognize that it is patently clear that the position has absolutely no chance of success. More simply put, if there is even modest difficult in resolving the merits of the challenged legal position, then the Rule 11 certification has been satisfied.

Helpful to the Court's determination is the extensive discussion of the law of sanctions in *Oliveri v. Thompson*, 803 F.2d 1265 (2d Cir.1986) in which an attorney was sanctioned for, among other acts, failure to withdraw a malicious prosecution claim. In this case, of course, Gordon was sanctioned for similar conduct, namely the failure to withdraw the adversary proceeding and the injunctive motion based on that cause of action. In *Oliveri*, the Second Circuit stated:

Like an award made pursuant to the court's inherent power, an award under § 1927 is proper when the attorney's actions are so completely without merit as to require the conclusion that they

must have been undertaken for some improper purpose such as delay. *See Acevedo v. Immigration and Naturalization Service*, 538 F.2d 918, 920 (2d Cir.1976). Although our precedents have not always made this bad-faith requirement clear, *see Cheng*, 713 F.2d at 891 n. 3 (stating that it need not be decided whether an award under § 1927 requires a finding of bad faith or merely "unreasonable conduct"), we hold today that an award made under § 1927 must be supported by a finding of bad faith similar to that necessary to invoke the court's inherent power, *accord Colucci v. New York Times Co.*, 533 F.Supp. 1011, 1013–14 (S.D.N.Y.1982) (Weinfield, J.). Indeed, the only meaningful difference between an award made under § 1927 and one made by the Court's inherent power is, as noted above, that awards under § 1927 are made only against attorneys or other persons authorized to practice before the courts while an award made under the court's inherent power may be made against an attorney, a party, or both.

*Oliveri*, 803 F.2d at 1273.

Finally, the Court notes that the Bankruptcy Court apparently considered the fact that Gordon invoked the Fifth Amendment privilege against self-incrimination in declining to testify at a deposition on March 4, 1996. This field of the law is not entirely clear. Some cases hold that the plaintiff must appear for the deposition and selectively decide which questions to decline to answer. Also, because Gordon was in the guise of a plaintiff in pursuing his adversary proceeding, some lower court cases have held that the plaintiff must choose between silence or the continuation of his lawsuit. However, there are persuasive precedents to the contrary.

In *Wehling v. Columbia Broadcasting System*, 608 F.2d 1084 (5th Cir.1979) a plaintiff in a libel action refused to answer certain questions at an oral deposition, asserting his Fifth Amendment privilege. The District Court dismissed his action based on this conduct. The Circuit Court reversed, holding that there is no authority for such sanctions in the federal discovery rules and because it was constitutionally impermissible:

> We hold that the district court erred in concluding that plaintiff's assertion of his self-incrimination privilege during pretrial discovery automatically required the dismissal of his libel action. *First, we find no provision in the federal discovery rules which authorize a court to impose sanctions on a party who resists discovery by asserting a valid claim of privilege.* *See* 8 C. Wright & A. Miller, *Federal Practice and Procedures* § 2018 (1970). Rule 26 limits the scope of discovery to matter that is "not privileged." Because CBS had no right to information protected by the privilege against self-incrimination, Wehling did not violate the discovery rules when he declined to answer the questions posed at his deposition. In short, the district court had no authority to order Wehling to disclose privileged information and, consequently, should not have imposed sanctions when Wehling declined to answer.

> Second, we believe that dismissing a plaintiff's action with prejudice solely because he exercises his privilege against self-incrimination is constitutionally impermissible. Wehling had, in addition to his Fifth Amendment right to silence, a due process night to a judicial determination of his civil action. When the district court ordered Wehling to answer CBS' questions or suffer dismissal, it forced plaintiff to choose between his silence and his lawsuit. The Supreme Court has disapproved of procedures which require a party to surrender one constitutional right in order to assert another. *Simmons v. United States*, 390 U.S. 377, 394, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968). Similarly, the Court has emphasized that a party claiming the Fifth Amendment privilege should suffer no penalty for his silence:

In this context "penalty" is not restricted to fine or imprisonment. It means, as we said in *Griffin v. California*, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106, the imposition of any sanction which makes assertion of the Fifth Amendment privilege "costly."

*Spevack v. Klein*, 385 U.S. 511, 515, 87 S.Ct. 625, 628, 17 L.Ed.2d 574 (1967) (emphasis supplied).

*Wehling*, 608 F.2d at 1087–88.

■ Following *Wehling*, the Second Circuit has stated that when the privilege is raised in a civil case, the Court "should give due consideration to the nature of the proceeding, how and when the privilege was invoked, and the potential to harm or prejudice to opposing parties." *United States v. Certain Real Property and Premises Known as: 4003–4005 5th Ave., Brooklyn, N.Y.*, 55 F.3d 78, 84 (2d Cir. 1995). Indeed, "it is only when there is but a fanciful possibility of prosecution that a claim of fifth amendment privilege is not well-taken." *United States v. U.S. Currency*, 626 F.2d 11, 14 (6th Cir.1980); *United States v. Certain Real Property and Premises Known as 1344 Ridge Road, Laurel Hollow, Syosset, New York*, 751 F.Supp. 1060, 1063 (E.D.N.Y.1989).

It is within this framework that the Court addresses the decision to sanction Gordon.

#### D. *The Law Applied to the Facts in this Case*

■ Based on the record, this Court cannot say that Gordon had "absolutely no chance of success" in his adversary proceeding. *Rodick v. City of Schenectady*, 1 F.3d 1341, 1350 (2d Cir.1993) (citations omitted); *Kuntz v. Pardo*, 160 B.R. 35 (S.D.N.Y.1993). A review of the record reveals the following undisputed facts that were or could have been considered by the Bankruptcy Court:

1. Gordon apparently had control of the Penthouse; may have resided at the Penthouse; and definitely kept a large amount of personal property at the Penthouse including, among other things, clothing, a baby crib, a baby stroller, several items of personal jewelry, a hand-held massager, a shaving kit, toiletries, personal pictures, and personal papers (Appellee Brief, dated November 19, 1996, pp. 10–11).

2. Gordon was legally entitled to occupy the Penthouse under the terms of the lease which listed him as an "occupant."

3. The monthly rental bills were apparently paid by the entities controlled by Gordon, including Sterling Who's Who, but not by the Debtor.

4. Gordon provided some cash receipts showing that some of the contents of the Penthouse were purchased with his personal funds. In this regard, the Bankruptcy Court stated in her findings of fact that: "If Gordon had good reason to believe he could prove that certain items of personal property were debtor's property, then the objection to the sale motion would not be sanctionable *per se* as to Gordon" (Bankruptcy Court Finding No. 24).

5. Most importantly, Gordon was under the heavy constraints of impending serious federal criminal charges against him. A search warrant was executed against the premises of the debtor on March 29, 1995. At that time, most of the Debtor's records were seized by the Government and later returned. Gordon was initially indicted on November 13, 1996. A subsequent superseding indictment was handed down on March 19, 1997. Gordon was charged with and subsequently convicted on 65 felony counts, including, conspiracy to commit mail fraud, mail fraud, obstruction of justice, conspiracy to impair and impede the Internal Revenue Service, evasion of income tax, filing a false document in the Internal Revenue Service, failing to pay income tax, filing a false tax return, filing a false collection information statement and money laundering.

Under these circumstances, even without resorting to hindsight, with the threat

of this widespread serious criminal investigation looming over him, it is understandable that Gordon was wary of testifying under oath as to the circumstances in both the bankruptcy proceeding and the criminal investigation. It is also reasonable to believe that Gordon would be leery about producing books and records that were relevant to both the criminal case and the bankruptcy proceeding. In the Court's view, this is not a scenario that warrants the imposition of sanctions.

Further, the Court notes that Gordon's new counsel, Backenroth & Grossman, LLP did sign a notice of voluntary dismissal of the adversary proceeding on Gordon's behalf pursuant to Rule 41(a) of the Federal Rules of Civil Procedure on March 27, 1996, prior to the imposition of sanctions. Thus, this adversary proceeding, which so concerned the Trustee and his counsel, existed only from February 28, 1996 to March 27, 1996, a period of 29 days.

### III. *CONCLUSIONS*

There is no doubt that the arguments presented by Gordon in the adversary proceeding were not persuasive. "Nevertheless to constitute a frivolous legal position for purposes of Rule 11 sanction, it must be clear and under existing precedents that there is no chance of success and no reasonable argument to extend, modify or reverse the law as it stands." *Mareno v. Rowe,* 910 F.2d at 1047. *See also Int'l Shipping Co. v. Hydra Offshore, Inc.,* 875 F.2d 388, 390 (2d Cir.), *cert. denied,* 493 U.S. 1003, 110 S.Ct. 563, 107 L.Ed.2d 558 (1989).

It is obvious that not all unsuccessful legal arguments are frivolous or warrant sanctions. In the Court's view, however, the positions advanced by Gordon and his attorney, although unpersuasive, were not so untenable, as a matter of law, as to necessitate the imposition sanctions. "Nor do they constitute the type of abuse of the adversary system that Rule 11 was designed to guard against." *Mareno v. Rowe,* 910 F.2d at 1047.

Based on the totality of the circumstances in this case, and the undisputed facts as stated above, the imposition of sanctions on Gordon constituted an abuse of discretion. Under the precedents, the Court finds that Gordon's adversary proceeding did have a chance of limited success as to some of the property in the Penthouse. Insofar as some of the property is concerned, there was some likelihood that the suit would be successful. In addition, the order of the Bankruptcy Judge under review stated that the sanctions imposed on Gordon "are based on his pursuit of the Complaint and the Injunction Motion when he knew or should have known that: (a) the Documents did not pertain to any criminal investigation, nor were they subject to the attorney-client privilege; and (b) the assets to be sold pursuant to the Sale Motion are properly of the Debtor's estate."

The Court finds that, in view of the widespread ongoing criminal investigation against him, Gordon may very well have presumed that the documents at issue did pertain to the criminal case and may have been subject to the attorney-client privilege. Furthermore, there is evidence supporting Gordon's contention that he personally owned some of the property in the Penthouse. In sum, the Court cannot find that the adversary proceeding had no chance of success or was frivolous. Nor can the Court conclude that Gordon's actions, in the light of the impeding criminal indictment, were contumacious or even unreasonable.

Accordingly, the order of the Bankruptcy Court, dated May 13, 1996, holding Gordon in contempt, is reversed and the Trustee's motion to sanction is denied. The further order of November 6, 1996, fixing sanctions in the amount of $12,556 is also reversed and set aside.

By this ruling, the Court does not in any way modify the consummated settlement of the sanctions imposed on Attorney Califano.

By this Decision and Order, the Clerk of the Court is directed to close these two cases.

**SO ORDERED.**